### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF KANSAS

ORLANDO CALVO-PINO,

        Plaintiff,

        v.

MATTHEW R. WEIDL, et al.,

        Defendants.

Case No. 20-2044-JAR-GEB

## MEMORANDUM AND ORDER

Plaintiff Orlando Calvo-Pino brings this civil rights action against Defendants Officer Matthew R. Weidl, Lawrence Interim Chief of Police Anthony Brixius, Douglas County Sheriff Randy Roberts, and the City of Lawrence, Kansas. Plaintiff alleges individual capacity claims against Officer Weidl and official capacity claims against the remaining Defendants. This matter is before the Court on Motions to Dismiss (Docs. 55, 58) the official capacity claims for failure to state a claim upon which relief can be granted filed by Sheriff Roberts, Interim Chief Brixius, and the City. The motions are fully briefed, and the Court is prepared to rule. As described more fully below, the Court grants in part and denies in part the motions to dismiss the official capacity claims alleged in the Second Amended Complaint.

## I.    Legal Standard

To pass muster under Fed. R. Civ. P. 12(b)(6), "the complaint must give the court reason to believe that *this* plaintiff has a reasonable likelihood of mustering factual support for *these* claims."[1] The plausibility standard does not require a showing of probability that a defendant

---

[1] *Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007).

has acted unlawfully, but requires more than "a sheer possibility."[2]  "[M]ere 'labels and conclusions,' and 'a formulaic recitation of the elements of a cause of action' will not suffice; a plaintiff must offer specific factual allegations to support each claim."[3]  Finally, the Court must accept the nonmoving party's factual allegations as true and may not dismiss on the ground that it appears unlikely the allegations can be proven.[4]

The Supreme Court has explained the analysis as a two-step process.  For the purposes of a motion to dismiss, the court "must take all the factual allegations in the complaint as true, [but] we 'are not bound to accept as true a legal conclusion couched as a factual allegation.'"[5]  Thus, the court must first determine if the allegations are factual and entitled to an assumption of truth, or merely legal conclusions that are not entitled to an assumption of truth.[6]  Second, the court must determine whether the factual allegations, when assumed true, "plausibly give rise to an entitlement to relief."[7]  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[8]  "While the [Rule] 12(b)(6) standard does not require that Plaintiff establish a prima facie case in [the] complaint, the elements of each alleged cause of action help to determine whether Plaintiff has set forth a plausible claim."[9]

---

[2] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

[3] *Kan. Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1214 (10th Cir. 2011) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

[4] *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).

[5] *Id.*

[6] *Id.* at 679.

[7] *Id.*

[8] *Id.* at 678.

[9] *Khalik v. United Air Lines*, 671 F.3d 1188, 1192 (10th Cir. 2012).

## II.    Facts Alleged in the Second Amended Complaint

The following material facts are alleged in the Second Amended Complaint ("SAC") and assumed to be true for purposes of deciding this motion.

Defendant Matthew Weidl is a police officer employed by the City of Lawrence, Kansas ("the City") Police Department.  Officer Weidl was assigned to the Lawrence/Douglas County Drug Enforcement Unit ("LDCDEU"), which includes officers from both the Lawrence Police Department ("LPD") and the Douglas County Sheriff's Office ("DCS").  The LDCDEU is a joint venture governed by a Memorandum of Understanding ("MOU").  The officers in this unit are cross-deputized; they work under the direction and supervision of commander-level officers from both agencies and are subject to LDCDEU rules, regulations, and training.  Duties of LDCDEU officers are divided under the MOU—DCS deputies work undercover in unmarked law enforcement vehicles and do not conduct traffic stops, while LPD officers are uniformed, drive marked law enforcement vehicles, and make traffic stops for purposes of interdicting illegal drug activities.  Revenues received from forfeitures by the LDCDEU are shared between the LPD and the DCS, with some revenues also provided to the Douglas County District Attorney and to the LDCDEU's own budget.

On February 2, 2018, shortly before 2:00 a.m., Plaintiff was driving his vehicle west on I-70 when he passed Officer Weidl, who was on patrol.  After passing the officer's vehicle, Plaintiff signaled and moved into Officer Weidl's lane before Weidl considered the lane change to be safe.  Officer Weidl followed Plaintiff for two miles and then initiated a traffic stop. Plaintiff, a Spanish speaker who knew little English, provided his Colorado driver's license and rental car documentation.  Due to this language barrier, Officer Weidl asked Plaintiff back to his

patrol car so that they could call an interpreter.  Plaintiff agreed, joined Officer Weidl in the

patrol car, and an interpreter promptly joined them by phone.

Officer Weidl eventually instructed the interpreter to explain that Plaintiff would be given

only a written warning, and that his assistance was only needed to get basic information correct.

Officer Weidl then spent roughly ten more minutes questioning Plaintiff in detail about his

family and where he had traveled.  Officer Weidl ultimately returned Plaintiff's information, but

as Plaintiff was walking back to his car, Officer Weidl re-engaged him by asking if he could ask

further questions and search the vehicle.  Plaintiff gave permission, and Officer Weidl—

eventually joined by another officer—searched the vehicle.  The officers observed a satchel

hanging from the driver's seat that contained a pistol and notebook with numbers.  They found

currency in a bag of dog food.

Officer Weidl then gave *Miranda* warnings to Plaintiff and Plaintiff agreed to speak with

him, informing the officers that the money was from the sale of horses some days before.

Officer Weidl ultimately arrested Plaintiff and took him to the Investigations and Training

Center in Lawrence for further processing and assistance.  Plaintiff was charged with Unlawful

Acts Involving Proceeds Derived from Violations of K.S.A. §§ 21-5701 through 21-5717, a drug

severity level 4 felony.  Plaintiff obtained defense counsel and eventually moved to suppress all

evidence obtained after Officer Weidl announced his intent to give Plaintiff only a warning.  A

Douglas County District Court granted the motion, finding Officer Weidl lacked reasonable

suspicion to prolong the traffic stop.

No LPD or DCS supervisor of Officer Weidl instructed or counseled him on how to

avoid unlawful prolonged detentions after a traffic stop.  In addition, no supervisor ever checked

Officer Weidl or monitored his law enforcement activities to determine whether he was avoiding

unlawful prolonged traffic stops during his highway drug interdiction duties, or whether he was improperly compromising the voluntary nature of traffic stops.

Neither LPD nor DCS supervisors (1) monitored and supervised LDCDEU officers conducting traffic stops as part of their highway drug interdiction activities; (2) made any inquiries, formal or informal, to determine whether or not LDCDEU officers were engaging in unlawfully prolonged traffic stops; (3) promulgated policies and practices to guide officers conducting drug interdiction traffic stops about how to avoid prolonged detentions; or (4) made efforts to determine whether Officer Weidl had been trained on how to avoid unlawfully prolonged traffic stops or nonconsensual interrogations. The City, Interim Chief Brixius and Sheriff Roberts failed to take these actions despite their awareness of legal precedent establishing how to conduct traffic stop interrogations that did not run afoul of the Fourth Amendment. Specifically, they were aware of national and state cases establishing that conduct similar to Officer Weidl's in this case was unconstitutional.

## III.    Discussion

This Court previously dismissed the official capacity claims alleged against the former Douglas County Sheriff, Sheriff McGovern, for failure to set forth a plausible claim of municipal liability. Plaintiff subsequently filed the SAC, reasserting official capacity claims against the new Douglas County Sheriff, Sheriff Roberts, and substituting Interim Chief Brixius for the previous LPD Chief. Suing Sheriff Roberts and Interim Chief Brixius in their official capacities "is essentially another way of pleading an action against the county or municipality [he] represent[s]."[10] Similar to the First Amended Complaint, the SAC purportedly alleges two

---

[10] *Porro v. Barnes*, 624 F.3d 1322, 1328 (10th Cir. 2010) (first citing *Monell v. Dep't of Soc. Servs. Of N.Y.*, 436 U.S. 658, 690 n.55 (1978); then citing *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998)).

official capacity claims.  Count IV alleges a failure-to-train claim against the City, Sheriff

Roberts, and Interim Chief Brixius; and Count V alleges an official-capacity claim against the

City, Sheriff Roberts, and Interim Chief Brixius based on the City's "official policies,

procedures, practices, customs, and usages or inadequate policies and procedure."[11]

Under *Monell v. Department of Social Services of the City of New York*,[12] an injured

plaintiff may hold a municipal entity liable "when execution of a government's policy or custom,

whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent

official policy, inflicts the injury."[13]  The claim has three general requirements: (1) an underlying

injury to a constitutional right of the plaintiff; (2) a municipal policy or custom, and (3) a direct

causal link between the policy or custom and the injury.[14]  Defendants do not dispute that

Plaintiff adequately alleged an underlying constitutional violation by Officer Weidl.  As with the

last motion to dismiss, these motions address the second prong of municipal liability—whether

Plaintiff sufficiently alleges a municipal policy or custom that caused his injuries.

**B.      Policy or Custom Standard**

A plaintiff may demonstrate a "municipal policy or custom" in one of several ways:

> (1) "a formal regulation or policy statement"; (2) an informal
> custom "amount[ing] to a 'widespread practice that, although not
> authorized by written law or express policy, is so permanent and
> well settled as to constitute a custom or usage with the force of
> law'"; (3) "the decisions of employees with final policymaking
> authority"; (4) "the ratification by such final policymakers of
> decisions—and the basis for them—of subordinates to whom the
> authority was delegated subject to these policymakers' review and
> approval"; or (5) the "failure to adequately train or supervise

---

[11] Doc. 54 ¶ 76.

[12] 436 U.S. 658 (1978).

[13] *Id.* at 694.

[14] *See Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 770 (10th Cir. 2013).

> employees, so long as that failure results from 'deliberate
> indifference' to the injuries that may be caused."[15]

However, *Monell* claims are not meant to create *respondeat superior* liability for every constitutional violation that may involve a municipal employee.[16]  Ordinarily, a single incident of unconstitutional behavior is insufficient to impose municipal liability.[17]

"A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train."[18]  Because theories alleging failure to train or supervise are "far more nebulous" than other policy-based claims, a plaintiff must show that an alleged failure to train amounted to "deliberate indifference to the rights of persons with whom the [untrained employee] came into contact."[19]  Whether styled as training, supervision, or policy, "[w]hen the asserted policy consists of the failure to act," the claim remains subject to the deliberate indifference standard.[20]  Under the "deliberate indifference" standard, "[a] pattern of similar constitutional violations by untrained employees is 'ordinarily necessary.'"[21]  "Evidence of 'a pre-existing pattern of violations' is only unnecessary 'in a narrow range of circumstances,' 'however rare,' in which 'the unconstitutional consequences of a failure to train' are 'highly predictable' and 'patently obvious.'"[22]

---

[15] *Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010) (alteration in original) (quoting *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 602 F.3d 1175, 1189–90 (10th Cir. 2010)).

[16] *Monell*, 436 U.S. at 691.

[17] *See Butler v. City of Norman*, 992 F.2d 1053, 1055 (10th Cir. 1993).

[18] *Connick v. Thompson*, 563 U.S. 51, 61 (2011).

[19] *Id.* (alteration in original) (quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)).

[20] *Hinton v. City of Elwood*, 997 F.2d 774, 782 (10th Cir. 1993) (discussing deliberate indifference standard in the context of failure-to-adopt policy claims).

[21] *Connick*, 563 U.S. at 62 (quoting *Bd. of Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 409 (1997)).

[22] *Waller v. City & Cnty. of Denver*, 932 F.3d 1277, 1285 (10th Cir. 2019) (quoting *Connick*, 563 U.S. at 62–64); *see City of Canton*, 489 U.S. at 389 ("'[M]unicipal liability under § 1983 attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives' by city policymakers.").

### C.      Sufficiency of Allegations in the SAC

#### 1.      Official Policy, Procedure, Practice, Custom, or Usage

In Count V, Plaintiff asserts a claim based on "official" policy, procedure, practice, custom or usage.  Alternatively, Plaintiff alleges that there were inadequate policies and procedures in place to guard against Officer Weidl's conduct.  Plaintiff's claim in Count V based on policy or custom falls short for the same reasons identified in the Court's last order.  Plaintiff states that there are "certain policies, procedures, practices, customs, and usages relating to the failures or actions of officers assigned to the LDCDEU" relating to prolonged detentions during traffic stops, unlawfully searching vehicles after obtaining coerced consent, and making unlawful arrests without probable cause during traffic stops.[23]  But Plaintiff does not point to any particular policy (in the MOU or elsewhere), any pattern of misconduct within any of the departments supervised by these Defendants, or any informal policy or custom that he has learned about through another source.[24]  Instead, Plaintiff stands on conclusory assertions to meet this element of his claim, which do not suffice.  Thus, Plaintiff fails to sufficiently allege a a *Monell* claim based on policy, procedure, practice, custom, or usage.

---

[23] Doc. 54 ¶ 77.

[24] *See Griego v. City of Albuquerque*, 100 F. Supp. 3d 1192, 1213 (D.N.M. 2015) ("With formal or written policies, satisfying this pleading standard is easy; the plaintiff can simply allege what the policy is and where it is codified. With informal, unwritten policies, customs, or practices, the plaintiff can plead either a pattern of multiple similar instances of misconduct . . . or use other evidence, such as [] police officers' statements attesting to the policy's existence."); *see also, e.g., Sherman v. Klenke*, 653 F. App'x 580, 593 (10th Cir. 2016) (finding assertion of a policy standing alone was "wholly conclusory" and would not survive a motion to dismiss); *Ward v. City of Hobbs*, 398 F. Supp. 3d 991, 1041 (D.N.M. 2019) ("at the pleading stage, the existence of a *Monell* policy is a conclusion up to which a plaintiff must build, rather than a fact that a plaintiff may baldly assert."); *Granato v. City & Cnty. of Denver*, No. 11-cv-00304-MSK-BNB, 2011 WL 3820730, at *8 (D. Colo. Aug. 30, 2011) (dismissing complaint because it provided only conclusory allegations and failed to identify "precisely what particular custom or policy" of the municipality the individual defendant was acting pursuant to, nor how that custom or policy acted to cause the individual defendant to violate the plaintiff's rights).

### 2.     Final Policymakers and Ratification

Plaintiff also attempts to shoehorn a theory of final policymaker decision-making or ratification in Count V paragraphs 79–81, but again, these assertions are conclusory.  Assuming as true that the municipal Defendants have authority to recommend or pass policies or practices that would have provided Officer Weidl with better training is not sufficient to show that these Defendants in fact made or ratified a decision as final policymakers that caused the constitutional violation.  Accordingly, Plaintiff fails to allege a constitutional violation based on final policy decisionmaking or ratification.

### 3.     Failure to Train and Supervise

The remainder of Plaintiff's official capacity allegations in Counts IV and V rest on the theory that Defendants' lack of or inadequate training and/or supervision caused the underlying constitutional violation by Officer Weidl.  Such allegations are subject to the deliberate indifference standard.   Therefore, Plaintiff must either allege a pattern of similar constitutional violations by untrained employees, or that this is one of the rare circumstances where despite such a pattern, the unconstitutional consequences of Defendants' failure to train are "highly predictable" and "patently obvious."[25]

Like the First Amended Complaint, the SAC lacks factual allegations of a pattern of similar constitutional violations by LPD, DCS employees, or LDCDEU officers.  Plaintiff's allegation that Defendants were aware of "unconstitutional and widespread . . . cases throughout Kansas suppressing evidence . . . 'under strikingly similar circumstances,'" is not sufficient to

---

[25] *See, e.g.*, *Waller*, 932 F.3d at 1285.

show a pattern of similar constitutional violations for purposes of deliberate indifference.[26]  First, similar constitutional violations outside of the LPD, DCS, or LDCEEU are not relevant to the question of whether these municipal Defendants were deliberately indifferent to the known or obvious risk that officers supervised by them would commit similar unconstitutional conduct.[27]  Second, the deliberate indifference standard is not whether the municipal defendants are on notice of the governing legal standards.  The standard is whether they are on notice that their failure to train "is deficient in a particular respect."[28]  Otherwise, "decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights."[29]  There are no allegations that Officer Weidl in particular, or LDCDEU officers in general, had a pattern of prolonging traffic stops without the reasonable suspicion required under the Fourth Amendment.

Without a pattern of constitutional violations, Plaintiff must allege facts demonstrating that this is one of the rare circumstances where the consequences of the failure to train are obvious.  Defendants assert without analysis that Plaintiff fails to meet this standard.  The Supreme Court has described the obviousness standard as follows:

> In *Canton*, the Court left open the possibility that, "in a narrow range of circumstances," a pattern of similar violations might not be necessary to show deliberate indifference.  The Court posed the hypothetical example of a city that arms its police force with firearms and deploys the armed officers into the public to capture fleeing felons without training the officers in the constitutional limitation on the use of deadly force.  Given the known frequency with which police attempt to arrest fleeing felons and the "predictability that an officer lacking specific tools to

---

[26] *See* Doc. 54 at 13–14 (listing cases suppressing evidence stemming from traffic stops by officers with the Kansas Highway Patrol, Junction City Police Department, Geary County Sheriff's Department, and the Topeka Police Department).

[27] *Waller*, 932 F.3d at 1286.

[28] *Id.* at 1285 (quoting *Connick*, 563 U.S. at 62).

[29] *Id.*

handle that situation will violate citizens' rights," the Court
theorized that a city's decision not to train the officers about
constitutional limits on the use of deadly force could reflect the
city's deliberate indifference to the "highly predictable
consequence," namely, violations of constitutional rights.  The
Court sought not to foreclose the possibility, however rare, that the
unconstitutional consequences of failing to train could be so
patently obvious that a city could be liable under § 1983 without
proof of a pre-existing pattern of violations.[30]

Here, the SAC alleges that (1) LPD officers within the LDCDEU drove marked law

enforcement vehicles and made traffic stops for the purpose of drug interdiction; (2) binding

caselaw established the illegality of prolonged traffic stops similar to Officer Weidl's prolonged

stop of Plaintiff's vehicle in February 2018;[31] and (3) none of the municipal defendants had

policies or practices in place to guide officers like Officer Weidl on the factors they must

consider when deciding whether to prolong a traffic stop.  Because the municipal Defendants

wholly failed to monitor, supervise, inquire, or devise written or unwritten policies and practices

to guide their officers' conduct during traffic stops, Plaintiff argues that the ensuing

constitutional violation was highly predictable.

The Court agrees that, at this stage, the SAC presents enough facts suggesting this is one

of the rare circumstances where a pattern of similar unconstitutional conduct by untrained

officers is not necessary.  The Court must assume as true at the pleading stage that the municipal

defendants provided no training on the factors that should have guided Officer Weidl's traffic

stop.  According to the SAC, the LPD officers that are part of the LDCDEU unit are expected to

conduct traffic stops for purposes of drug interdiction.  Therefore, a complete lack of training on

the Fourth Amendment standards that govern such conduct would predictably lead to

---

[30] *Connick*, 563 U.S. at 63–64 (quoting *Bd. of Cnty. Comm'rs  v. Brown*, 520 U.S. 397, 409 (1997)) (citing *City of Canton v. Harris*, 489 U.S. 378, 390 (1989)).

[31] *See, e.g.*, *Vasquez v. Lewis*, 834 F.3d 1132, 1138–39 (10th Cir. 2016).

constitutional violations.  Unlike cases addressing allegations of sexual assault or discrimination, the factors relevant to an officer's reasonable suspicion determination during a traffic stop are not necessarily obvious to an untrained officer.[32]  Accordingly, the Court denies Defendants' motions to dismiss as to Plaintiff's official capacity claims alleging Plaintiff's constitutional injury was caused by a failure-to-train or supervise, or by inadequate training or supervision.

**IT IS THEREFORE ORDERED BY THE COURT** that Defendants' Motions to Dismiss (Docs. 55, 58) the official capacity claims are **granted in part and denied in part**.  The claims based on lack of or inadequate training and supervision are **denied**.  The motion is otherwise **granted**.

**IT IS SO ORDERED.**

Dated: January 25, 2021

S/ Julie A. Robinson
JULIE A. ROBINSON
CHIEF UNITED STATES DISTRICT JUDGE

---

[32] *See Waller*, 932 F.3d at 1288 ("Even an untrained law enforcement officer should have been well aware that any use of force in this situation—where a restrained detainee was simply addressing a judge at a hearing in a polite, calm voice—was inappropriate.  This case does not involve technical knowledge or ambiguous 'gray areas' in the law that would make it 'highly predictable' that a deputy sheriff . . . would need 'additional specified training' to know how to handle the situation correctly." (quoting *Connic*, 563 U.S. at 71)); *Sturdivant v. Blue Valley Unified Sch. Dist.*, 469 F. Supp. 3d 1121, 1134 (D. Kan. 2020) ("courts have recognized that the illegality of race discrimination and retaliation is patently obvious to all and, accordingly, have rejected failure-to-train claims based on a municipality's failure to train employees on those topics.").